IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**CARRIE MAROTTA,**                              Case No. 1:16 CV 1169

     Plaintiff,

     v.                                         Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

     Defendant.                                 MEMORANDUM OPINION AND ORDER


### INTRODUCTION

Plaintiff Carrie Marotta ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction pursuant to 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 14). For the reasons stated below, the undersigned affirms the Commissioner's decision.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in August 2012, alleging a disability onset date of June 3, 2008.[1] (Tr. 219-26, 226-31). Her claims were denied initially and upon reconsideration. (Tr. 162-63, 166-67, 175-77, 182-86). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 187-88). Plaintiff (represented by counsel) and a vocational expert ("VE") testified at a hearing before the ALJ on August 21, 2014. (Tr. 63-97). On September 23, 2014, the ALJ found Plaintiff not disabled in a written decision. (Tr. 48-57). The Appeals Council denied

---

1. At the hearing, Plaintiff amended her alleged onset date to August 7, 2012. (Tr. 265)

Plaintiff's request for review. (Tr. 1-3). Plaintiff then filed the instant action on May 17, 2016. (Doc. 1).

**FACTUAL BACKGROUND**[2]

### *Personal Background and Testimony*

Plaintiff was born in June 1971 and was 41 years old as of her alleged onset date. *See* Tr. 219. She had completed the twelfth grade, although through ninth grade, she was in classes for students with learning disabilities. (Tr. 83). At the time of the hearing, Plaintiff lived with her mother and stepfather. (Tr. 71). Her household chores included dishes and cleaning her room, but her mother "pretty much [did] everything for [her]". *Id.* She "[s]ometimes" helped with folding laundry, and accompanied her mother grocery shopping. *Id.*

Plaintiff used to drive, but quit several years prior due to severe headaches. (Tr. 71-72). She took the bus or her mother drove her places. (Tr. 72). Plaintiff used a cell phone, but not a computer. *Id.* She testified to having no hobbies and belonging to no clubs or organizations. *Id.* In response to a question about how Plaintiff spends a "normal day", she replied: "I basically just talk. You know, like I'll call a friend or read a book, sit outside." *Id.* Plaintiff saw her older sister on occasion "when she stop[ped] over for her lunch break", and had "[j]ust one" friend with whom she kept in touch. (Tr. 72-73). Plaintiff previously walked for exercise, but stopped because she "was passing out". (Tr. 82).

---

2. The undersigned here summarizes only the relevant evidence. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (issues not raised in claimant's brief waived). Plaintiff challenges the ALJ's treatment of her mental impairments (in relation to a consultative examiner's opinion). As such, the undersigned here summarizes only the medical records related to that claim. The undersigned addresses the facts relating to Plaintiff's sentence six remand claim within that section of the opinion.

Plaintiff stated she thought her mental health problems were the most significant problem preventing her from working, specifically, her "rage". (Tr. 80-81). Plaintiff took Ritalin at age 19, but was not taking any medication for mental health issues at the time of the hearing. *Id.* Plaintiff testified she was fired from previous work for "[a]ttitude." (Tr. 79). She described it as:

> Like for instance, they would tell me what to do. I would just like blow up at them for no reason. I'd just get like real - - I can't explain it, like real quick, short fused, and they didn't - - you know, they won't put up with that, so.

*Id.* She testified she "had probably two warnings" before being fired for this reason. *Id.* She also testified to a "confrontation with the manager" at one job. (Tr. 80).

Plaintiff also testified to a 2006 argument with an ex-boyfriend that got physical ("I threw something at him. He came back at me. It was back and forth and it just developed from there."). (Tr. 82). She was placed on probation for a year after the incident. *Id.*

### Relevant Medical Evidence

#### Consultative Examiner

In October 2012, Plaintiff underwent a psychological evaluation with Charles Misja, Ph.D. (Tr. 485-90). Dr. Misja stated Plaintiff reported mood swings, a bad temper, and that "she can't get along with anybody." (Tr. 485). She had a previous charge for domestic violence, but was uncertain about whether she had been convicted. (Tr. 486). As a result, she was required to attend an anger management course, which she completed, "but stated it didn't help much." *Id.* She also related information about her 1989 car accident which left her in a coma for three weeks. *Id.* Plaintiff reported she had never received any mental health treatment. *Id.* Dr. Misja noted Plaintiff had previously worked, but was fired or quit due to anger and attitude issues. (Tr. 487) ("She stated that either she gets fired or just quits, but her jobs almost always have a bad ending.");

(Tr. 489) ("She stated she's lost almost every job because of her explosive temper and inability to get along with people.").

Plaintiff also reported her mother does most household chores and Plaintiff "stated she has virtually no responsibilities around the house." (Tr. 487). She has a driver's license, but does not own a car, so she depends on her mother, walks, or takes the bus. *Id.* She reported having "virtually no friends that she socializes with". *Id.* She had a boyfriend she saw once or twice per week. *Id.* She walked outside "for exercise and relaxation" and watched television "a little bit." *Id.* Plaintiff showered two or three times a day and her mother described her as "germophobic". *Id.* Dr. Misja estimated that Plaintiff and her mother were "reliable reporters". (Tr. 489).

Dr. Misja described Plaintiff as "friendly" and noted "rapport was easily established and flow of conversation readily developed." (Tr. 487). She also "made appropriate eye contact." *Id.* Additionally, her speech was "unremarkable and free from pathology such as loose associations", though she "spoke rapidly at times." *Id.*

Dr. Misja noted Plaintiff's affect was "broad" and her mood was "slightly depressed and stable." (Tr. 488). Plaintiff stated she knew she was depressed, and rated her depression "as a 10 on most days". *Id.* She rated her anxiety as a 5 on most days. *Id.* She "swung her leg and repositioned herself on the couch many times" during the interview, which Dr. Misja noted as evidence of anxiety. *Id.* She reported that she "love[s] people but . . . want[s] to be by [her]self." *Id.* "She has feelings of hopelessness, despair, guilt, and worthlessness on a regular basis to a moderate to severe range." *Id.* Plaintiff had "anger episodes" about twice per week when she gets "'out of control'[,] meaning she slams the door and gets loud". *Id.* Dr. Misja noted Plaintiff's "energy level is high but her motivation is low". *Id.*

Dr. Misja estimated Plaintiff was in the low average range of intelligence, and noted her insight was "poor to fair" and her judgment was "fair". *Id.* He assessed intermittent explosive disorder, major depression, and obsessive-compulsive disorder and assessed a GAF score of 45. (Tr. 488-89).[3] He noted Plaintiff "presented at the interview as high energy, pleasant and cooperative and displayed none of the nastiness or meanness that both her and her mother mentioned.", though "[i]t appeared that her general emotional maturity was far below her chronological age." (Tr. 489). He explained that she "leads an unstructured life with virtually no structure or demands on her" and explained that "[s]he may benefit from a referral to the BVR or perhaps even job coaching." *Id.*

In his functional assessment, Dr. Misja stated Plaintiff would have "no significant problem" in understanding, remembering, and carrying out "ordinary instructions." *Id.* Additionally, he estimated her problems in the area of maintaining attention and concentration, and in maintaining persistence and pace, and to perform simple or multi-step tasks would be "minimal". *Id.* ("She was able to persist and focus during the brief intellectual screening[.]"). Dr. Misja, however, thought Plaintiff's problems in the ability to respond appropriately to supervision and to coworkers in a work setting would be "in the severe range". (Tr. 490). This was so, he explained, due to her intermittent explosive disorder which "manifested by episode of about twice

---

3. The Global Assessment of Functioning ("GAF") scale represented a "clinician's judgment" of an individual's symptom severity or level of functioning. Am. Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders,* 32-33 (4th ed., Text Rev. 2000). "The most recent (5th) edition of the Diagnostic and Statistical Manual of Mental Disorders does not include the GAF scale." *Judy v. Colvin,* 2014 WL 1599562, at *11 (S.D. Ohio); *see also* Am. Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013) ("DSM-V") (noting recommendations "that the GAF be dropped from [DSM–V] for several reasons, including its conceptual lack of clarity . . . and questionable psychometrics in routine practice"). However, as set forth in the DSM-IV, a GAF score of 41-50 indicated "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34.

a week at home" and that she "admitted that she gets angry and gets mean and nasty." *Id.* Dr. Misja noted Plaintiff had lost "almost every job she's had because of her ability to get along with people and "[s]he expressed little regret and no intention of changing her behavior or even addressing it." *Id.* Dr. Misja similarly noted Plaintiff's abilities to respond appropriately to work pressures in a work setting would be "in the severe range" due to her "history strongly suggest[ing] that she will not be able to adequately cope with interpersonal tension and stress in the workplace environment." *Id.*

*State Agency Reviewers*

In November 2012, Bonnie Katz, Ph.D., reviewed Plaintiff's records at the request of the state agency. (Tr. 107-09). Dr. Katz concluded Plaintiff would be moderately limited in her ability to: 1) understand and remember detailed instructions; 2) carry out detailed instructions; 3) maintain attention and concentration for extended periods; 4) sustain an ordinary routine without special supervision; 5) work in coordination with or in proximity to others without being distracted by them; and 6) complete a normal workday and workweek without interruptions from psychologically based symptoms. (Tr. 107-08). Dr. Katz also opined Plaintiff would be markedly limited in her ability to interact appropriately with the general public, as well as moderately limited in her ability to get along with coworkers or peers, and to maintain socially appropriate behaviors. (Tr. 109). Dr. Katz noted Plaintiff was capable of performing without fast pace, no strict production quotas, no interaction with the public, and minimal interaction with supervisors and coworkers. *Id.* She could "adapt to occasional changes in routine that are introduced in advance and explained fully", and "make simple decisions but would rely on others to provide guidance and reassurance". *Id.*

In April 2013, Aracelis Rivera, Psy.D., reviewed Plaintiff's records on reconsideration. (Tr. 139-41). Dr. Rivera agreed with Dr. Katz's conclusions. (Tr. 139-40).

Both state agency reviewing physicians recognized that Dr. Misja's opinion was more restrictive than their own, and stated that opinion was "an overstatement of the severity of [Plaintiff]'s restrictions/limitations and based on only a snapshot of [Plaintiff]'s functioning." (Tr. 110, 141).

### VE Testimony, ALJ Decision & Appeals Council Denial of Review

#### VE Testimony

A VE testified at the hearing before the ALJ. (Tr. 90-97). In her first hypothetical question, the ALJ asked the VE to consider an individual with the same age, education, and past work as Plaintiff who:

> is able to occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds, is able to stand and walk six hours of an eight-hour workday, is able to sit for six hours of an eight-hour workday, would have unlimited push and pull other than shown for lift and/or carry, could never climb ladders, ropes or scaffolds, could frequently stoop, crouch and crawl and must avoid all concentrated . . . exposure to fumes, odors, dust, gases and poor ventilation[;] . . . can perform simple, routine tasks consistent with unskilled work with no fast pace or high production quotas and with no direct work or interaction with the general public and superficial interactions with the supervisors and co-workers and by superficial [meaning] of a short duration for a specific purpose[;] . . . can adapt to occasional changes in routine that are introduced in advance and explained fully.

(Tr. 93-94). The VE testified such an individual could not perform Plaintiff's past work, but could perform work: in bench assembly inspection, such as inspector and hand packager; as an assembler of plastic hospital products; or as an electrical equipment inspector. (Tr. 94-95).

For a second hypothetical question, the ALJ retained the same restrictions, but added a limitation to "low stress work and by that I mean, no arbitration, negotiation, responsibility for the

safety of others or supervisory responsibility." (Tr. 95). The VE testified that the same jobs identified previously would still be available. *Id.*

For a third hypothetical question, the ALJ added a further restriction of "no overhead reaching with the left upper extremity and frequent handling and fingering with the left upper extremity only." *Id.* The VE again testified that the same jobs would be available to such an individual. *Id.*

In her final hypothetical, the ALJ retained the same restrictions, and added a limitation that the individual "might be absent from work two or more days per month due to symptoms from asthma and/or migraine headaches." (Tr. 96). The VE testified that no jobs would be available to such an individual. *Id.*

Plaintiff's attorney asked the VE "if the hypothetical individual has an explosive episode at work once a week, it might be of short duration, you know, 5 to 10 minutes, but it's going to happen once a week [and] [i]t's going to take her off task, take her co-workers off task, is that individual going to be able to sustain and retain employment?" (Tr. 96-97). The VE replied in the negative. (Tr. 97).

*ALJ Decision*

In her written decision, the ALJ found Plaintiff's date last insured was December 31, 2013, and Plaintiff had not engaged in substantial gainful activity since her alleged onset date. (Tr. 50). She concluded Plaintiff had severe impairments of "degenerative disc disease (thoracic), disorder of female genital organs, gastrointestinal disorder (gastric ulcer), asthma/chronic obstructive pulmonary disease, left rotator cuff impingement, migraines, affective disorder (major depressive disorder), anxiety disorder, personality disorder (intermittent explosive disorder) and obsessive

compulsive disorder." *Id.* The ALJ found that none of these impairments met or equaled the listings, Tr. 51-52, and Plaintiff retained the residual functional capacity (RFC) to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she is able to occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds, is able to stand and walk 6 hours of an 8-hour workday, is able to sit for 6 hours of an 8-hour workday, and has unlimited push and pull other than shown for lift and/or carry. She can never climb ladders, ropes and scaffolds; frequently stoop, crouch and crawl; and must avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. She should have no overhead reaching with the left upper extremity and no more than frequent handling and fingering with the left upper extremity. She can perform simple routine tasks (unskilled work), with no fast pace or high production quotas. She should have no direct work contact with the general public and superficial (meaning of a short duration for a specific purpose) interactions with supervisors and co-workers. She can adapt to occasional changes in routine that are introduced in advance and explained fully. She can perform low stress work meaning no arbitration, negotiation, responsibility for the safety of others or supervisory responsibility.

(Tr. 53). Considering this RFC, and based on the testimony of the VE, the ALJ found jobs existed in the national economy that such an individual could perform. (Tr. 56). Therefore, the ALJ found Plaintiff not disabled from her alleged onset date through the date of the decision. (Tr. 57).

*Appeals Council*

Plaintiff submitted additional evidence to the Appeals Council. (Tr. 5-6, 8-37). In declining to exercise jurisdiction, the Appeals Council stated:

> We also looked at medical records from Ikram Khan, M.D., dated October 27, 2014 through December 2, 2014, and Khaleel Deeb, M.D., dated January 15, 2015 through August 18, 2015. The Administrative Law Judge decided your case through September 23, 2014. This new information is about a later time. Therefore it does not affect the decision about whether you were disabled beginning on or before September 23, 2014.

(Tr. 2).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

10

4.      Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff presents two arguments: 1) the ALJ failed to properly evaluate the opinion of consultative psychologist, Dr. Misja; and 2) the Appeals Council erred in failing to remand the matter based on new and material evidence (and such a remand is appropriate here).

*Consultative Psychologist Opinion*

Plaintiff contends the ALJ erred in her evaluation of Dr. Misja's opinion, and, as a result, the RFC lacks the support of substantial evidence. (Doc. 17, at 12-16). Specifically, she argues the ALJ's reasoning was vague and unsupported by the record. The Commissioner responds that the ALJ reasonably weighed Dr. Misja's opinion and her reasoning for giving that opinion limited weight is supported.

In her decision, the ALJ summarized Dr. Misja's opinion, and then explained the weight assigned to it:

The psychological consultative examiner opined that ordinary instructions should be of no significant problem for her. She was able to persist and focus during the

11

brief intellectual screening and it is estimated that problems in maintaining attention and concentration and persistence and pace to perform simple tasks and to perform multi-step tasks are likely to be minimal. Based on the report of her and her mother, he noted severe problems with responding appropriately to supervision and coworkers in a work setting and responding appropriately to work pressures in a work setting. The examiner assigned a GAF of 45. [citing Tr. 485-90]. The examiner's opinion is given limited weight. The very low GAF is inconsistent with the claimant's presentation at the evaluation, as well as the other medical evidence of record, which notes no significant mental health complaints or findings. Further, it is inconsistent with the fact that the claimant has no mental health treatment. The examiner's findings are based almost entirely on the subjective complaints of the claimant and her mother. The record does not support more than moderate limitations in social functioning and concentration, persistence, and pace. She is capable of simple, routine tasks with no fast pace or high production quotas and no direct work contact with the general public and only superficial interactions with supervisors and co-workers. She is also provided the accommodations of only occasional changes in routine and only low stress work.

(Tr. 55).

First, an ALJ is not required to provide the same "good reasons" for discounting a one-time examining physician as she is for a treating physician. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) ("the SSA requires ALJs to give reasons for only *treating* sources"). Similarly, a consultative examiner's opinion is not entitled to the same controlling weight presumption as a treating physician. *Id.* The ALJ is, however, to weigh the opinion of agency examining physicians under the same factors as treating physicians, including the supportability and consistency of those opinions. *See* 20 C.F.R. § 404.1527(d). Although the explanatory requirement "does not apply to opinions from physicians who . . . have examined but not treated a claimant, the ALJ's decision still must say enough to allow the appellate court to race the path of his reasoning." *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011). Thus the question is not one of "good reasons", but rather whether the ALJ's reasoning in this regard is supported by substantial evidence. As discussed below, the undersigned concludes that it is.

12

Plaintiff contends it was error to give more weight to the state agency reviewing physicians than to Dr. Misja because the former did not examine her. *See* 20 C.F.R. § 404.1527(c)(1) ("Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."). But whether a source conducted an examination is only one of several factors that the ALJ considers when weighing medical opinions. *See* 20 C.F.R. § 404.1527(c). Here, the ALJ also discussed the supportability and consistency of the opinion.

The ALJ addressed the supportability of Dr. Misja's opinions, noting that his conclusions were inconsistent with his observations. (Tr. 55) ("The very low GAF is inconsistent with the claimant's presentation at the evaluation[.]"). This has support in the record. Dr. Misja noted Plaintiff "was friendly and rapport was easily established", "a flow of conversation readily developed", and she "made appropriate eye contact." (Tr. 487). He also noted that Plaintiff's "speech was unremarkable", though "rapid[] at times." *Id.* Plaintiff's "[a]ffect was broad" and her mood was "slightly depressed and stable." (Tr. 488). Moreover, Dr. Misja noted Plaintiff "presented at the interview as high energy, pleasant and cooperative and displayed none of the nastiness or meanness that both her and her mother mentioned." (Tr. 489). These observations were contrary to Dr. Misja's opinion that Plaintiff's GAF score was 45, indicative of "serious symptoms", "e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34.

The ALJ also noted Dr. Misja's conclusions were inconsistent with the record as a whole. (Tr. 55) ("The very low GAF is inconsistent with . . . the other medical evidence of record, which notes no significant mental health complaints or findings. Further, it is inconsistent with the fact

13

that the claimant has no mental health treatment."). The ALJ was correct, and Plaintiff has pointed

to no evidence of mental health complaints or findings in the record.[4] Plaintiff correctly points out

that the Sixth Circuit has cautioned that "ALJs must be careful not to assume that a patient's failure

to receive mental-health [sic] treatment evidences a tranquil mental state." *White v. Comm'r of

Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009). This is so because "[f]or some mental disorders, the

very failure to seek treatment is simply another symptom of the disorder itself." *Id.* Here, however,

Plaintiff has suggested no evidence to show her failure to seek treatment is a result of her mental

disorder. *See, e.g.*, *Smith v. Colvin*, 2017 WL 427359, at *11 (S.D. Ohio) ("However, here, there

is no indication that she did not seek treatment as a result of her impairments."), *report and

recommendation adopted*, *Smith v. Berryhill*, 2017 WL 929163 (S.D. Ohio). In *White* itself, the

case Plaintiff cites, the Sixth Circuit further stated: "But in this case there is no evidence in the

record explaining White's failure to seek treatment during this half year gap. A 'reasonable mind'

might therefore find that the lack of treatment during [this] time frame indicated an alleviation of

White's symptoms." 572 F.3d at 283-84. Moreover, although "before drawing a negative inference

from an individual's failure to seek or pursue regular medical treatment, the ALJ must consider

any explanations that the individual may provide, or other information in the case record, that may

explain infrequent or irregular medical visits or failure to seek medical treatment", *Dooley v.

Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 (6th Cir. 2016) (internal quotation and citation

omitted), Plaintiff points to no such evidence or explanation here. As such "that bar [does] not

apply here." *Todd v. Comm'r of Soc. Sec.*, 2017 WL 715752, at *10 (S.D. Ohio) *report and

recommendation adopted*, 2017 WL 978590 (S.D. Ohio). Finally, the record reflects Plaintiff was

---

4. Contrary to the cases cited in Plaintiff's brief, this is not a case where Plaintiff failed to follow prescribed treatment, but is rather a case where Plaintiff had no mental health treatment.

willing and able to seek treatment for other impairments. *Compare, e.g. Mullendore v. Comm'r of Soc. Sec.*, 2017 WL 1196367, at \*7 (E.D. Mich.) ("However in this case, the 500-plus page medical transcript shows that Plaintiff sought treatment for a plethora of conditions on a frequent basis. None of the records show that her ability to obtain proper treatment was compromised by mental health problems."); *Brooks v. Comm'r of Soc. Sec.*, 2016 WL 6987096, at \*7 (E.D. Mich.) ("Whereas Blankenship [the Plaintiff in *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989)], suffering from schizophrenia, did not seek regular treatment for *either* the physical or psychiatric problems, *id.* at 1121-1124, current Plaintiff sought and received treatment on a regular basis for a plethora of other conditions. Indeed, the treating records . . . total[] a staggering 800 pages, supporting the conclusion that Plaintiff was disinclined (rather than psychologically incapable) to submit to long-term mental health treatment.") (emphasis in original). The undersigned therefore finds the ALJ did not err in considering the lack of mental health findings and treatment in the record as a reason for partially discounting Dr. Misja's opinion.

Finally, the ALJ properly discounted Dr. Misja's opinion in part because it was based on the subjective statements of Plaintiff and her mother. (Tr. 55) ("The examiner's findings are based almost entirely on the subjective complaints of the claimant and her mother."); *see* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."). Objective evidence in the psychiatric/psychological context includes "medical signs," 20 C.F.R. § 404.1512(b)(1), which are defined as "*psychological abnormalities which can be observed, apart from your statements* (symptoms).... Psychiatric signs are *medically demonstrable* phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts

that can be medically described and evaluated." 20 C.F.R. § 404.1528(b) (emphasis added)[5]. Dr.

Misja's opinion that Plaintiff would have "severe" problems in responding appropriately to

supervisors and co-workers was based on Plaintiff and her mother's report that Plaintiff has anger

episodes and that she had lost "almost every job she's had because of her inability to get along

with people." (Tr. 490). Similarly, Dr. Misja cited Plaintiff's self-reported "history" to support his

conclusion that she would have "severe" problems in responding appropriately to work pressures.

*Id.* These conclusions were therefore based on Plaintiff's subjective symptom reports and it was

not error for the ALJ to give less weight to them as a result. Notably, Dr. Misja mentioned that

Plaintiff "presented at the interview as high energy, pleasant and cooperative and displayed none

of the nastiness or meanness that both her and her mother mentioned." (Tr. 489).

Plaintiff further argues that the ALJ is unclear about her decision to Dr. Misja's opinion

"limited weight". Specifically, she argues:

> Clearly, the Judge gave the opinion weight insofar as the specific diagnoses Dr.
> Misja finds, since the ALJ specifically finds intermittent explosive disorder,
> depression and obsessive compulsive disorder all to constitute severe impairments.
> Beyond that, however, it is not clear what portions, if any, of Dr. Misja's report are
> credited by the Judge.

(Doc. 17, at 14). The undersigned disagrees that it is unclear. The ALJ's opinion aligns with Dr.

Misja's opinion that Plaintiff would not have problems understanding, remembering, and carrying

out instructions or maintaining attention and concentration. *Compare* Tr. 489-90 (Dr. Misja's

opinion that Plaintiff would have "no significant problem" or "minimal" problems in these areas)

*with* Tr. 53 (ALJ's RFC stating Plaintiff "can perform simple routine tasks"). Notably, the ALJ's

ultimate RFC also shows she did give some weight to Dr. Misja's opinion. Taking into account

---

5. Both 20 C.F.R. § 404.1512 and 20 C.F.R. § 404.1528 were amended effective March 27, 2017.
The undersigned references the prior version of the regulations in effect at the time of the ALJ's
decision.

Plaintiff's social limitations, the ALJ limited Plaintiff to "no direct work contact with the general public and superficial (meaning of a short duration for a specific purpose) interactions with supervisors and co-workers." (Tr. 55). The ALJ simply found such restrictions not as severe as Dr. Misja opined. She also took into account Plaintiff's limited ability to respond to work pressures, limiting her to only "occasional changes in routine that are introduced in advance and explained fully" and to "low stress work meaning no arbitration, negotiation, responsibility for the safety of others or supervisory responsibility." *Id.* Additionally, earlier in her opinion at Step Three, the ALJ explained her finding that Plaintiff had "moderate difficulties" in social functioning:

> She reported to the consultative examiner that she does not socialize with friends, but she has a boyfriend she sees once or twice a week. However, she testified that her activities of daily living include calling a friend or seeing her older sister who stops by on her lunch. While she reported difficulty getting along with others, she presented at her consultative examination as friendly, with appropriate eye contact. Rapport was easily established and the flow of conversation readily developed. She reported that she loves people but wants to be by herself. The examiner noted that she presented as high energy, pleasant, and cooperative and displayed none of the nastiness or meanness she and her mother had mentioned. He noted that her general emotional maturity was far below her chronological age. The State Agency psychological consultants who reviewed the claimant's case file determined that the claimant has moderate difficulty in social functioning which is consistent with the evidence.

(Tr. 52) (record citations omitted). This provides additional support to the ALJ's decision to rely on the state agency physicians over Dr. Misja in finding Plaintiff's social and work pressure restrictions less extreme. As noted above, the ALJ gave great weight to the state agency reviewing physicians. *See* Tr. 55. With the benefit of Dr. Misja's opinions and all the other evidence in the record, the state agency physicians—and the ALJ—simply reached different conclusions about Plaintiff's functional limitations than Dr. Misja did. And, for the reasons described above, those conclusions were reasonable.

Taken as a whole, the ALJ's discussion of Dr. Misja's opinion complies with the mandate that an ALJ must "say enough to allow the appellate court to trace the path of [her] reasoning." *Stacey*, 451 F. App'x at 519 (internal quotation marks omitted). The undersigned finds the ALJ's reasoning in this regard supported by substantial evidence.

*Sentence Six Remand*

Second, Plaintiff argues the Appeals Council erred in not remanding her case upon being presented with new evidence regarding the cause of Plaintiff's dizziness. (Doc. 17, at 16-17). The Commissioner responds that a sentence six remand is not appropriate. (Doc. 20, at 10-13).

Under the relevant agency regulations:

(b) If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R. § 404.970(b).[6] The Appeals Council addressed the additional records submitted by Plaintiff:

We also looked at medical records from Ikram Khan, M.D., dated October 27, 2014 through December 2, 2014, and Khaleel Deeb, M.D., dated January 15, 2015 through August 18, 2015. The Administrative Law Judge decided your case through September 23, 2014. This new information is about a later time. Therefore it does not affect the decision about whether you were disabled beginning on or before September 23, 2014.

(Tr. 2). The Appeals Council then noted Plaintiff would need to file a new application if she alleged disability after the ALJ's decision. *Id.* The Appeals Council thus determined the evidence submitted was not time-relevant to the ALJ's decision.

---

6. 20 C.F.R. § 404.970(b) was amended effective January 17, 2017. This is the prior version of the regulation in effect at the time of the Appeals Council decision.

When the Appeals Council declines to review the ALJ's decision, the ALJ's decision becomes the Commissioner's final decision. *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). While new and material evidence may be submitted for consideration to the Appeals Council, "we still review the ALJ's decision, not the denial of review by the appeals council." *Casey v. Sec'y,* 987 F.2d 1230, 1233 (6th Cir. 1993).

Notwithstanding the foregoing jurisdictional limitations, the Court has independent jurisdiction under "sentence six" of Section 405(g) to remand for consideration of additional evidence. A remand pursuant to sentence six is appropriate "only if the evidence is 'new' and 'material' and 'good cause' is shown for the failure to present the evidence to the ALJ." *Ferguson v. Comm'r of Soc. Sec.,* 628 F.3d 269, 276 (6th Cir. 2010). Evidence is "new" if it did not exist at the time of the administrative proceeding and "material" if there is a reasonable probability that a different result would have been reached if introduced during the original proceeding. *Id.* "Good cause" is demonstrated by "a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster v. Halter,* 279 F.3d 348, 357 (6th Cir. 2001).

Plaintiff does not meet this standard. The relevant time period under consideration before the ALJ was Plaintiff's onset date—August 7, 2012—through the date of the ALJ's decision— September 23, 2014. Plaintiff contends that Dr. Khan's November 2014 review of a 2001 MRI "provides a basis to understand why [Plaintiff] has symptoms of dizziness and syncope[.]" (Doc. 17, at 17); *see* Tr. 32 (November 2014 reference to "MRI head 2001" showing "[t]wo areas of encephalomalacia – one in the left frontal lobe and one in the right temporal lobe – consistent with the history of remote trauma."). However, the 2001 MRI referenced was performed eleven years prior to Plaintiff's alleged onset date, and the additional records submitted post-date the ALJ's

19

decision. *See* Tr. 8-37 (records dated October 2014 through August 2015). Plaintiff has failed to show a reasonable probability that a different result would have been reached if the ALJ had been presented with this additional evidence. Notably, during the time period under consideration by the ALJ, the only complaints of dizziness and syncope were two visits in September 2013. *See* Tr. 691-93 (September 26, 2013 visit with Marry Ellen Behmer, M.D., where Plaintiff reported three weeks of dizziness, worse with activity); Tr. 700 (September 28, 2013 emergency room visit reported increased dizziness with syncope, worse when standing). Plaintiff fails to show how, if the ALJ had a "basis to understand" her dizziness, she would have reached a different conclusion regarding Plaintiff's limitations during the relevant time period.

Although Plaintiff also points to evidence in these additional records that shows staring spells (possible "absence seizures"), Tr. 769 (October 2014); Tr. 29 (November 2014), and increased episodes of dizziness, Tr. 15 (March 2015), these worsening complaints all post-date the ALJ's decision, and as such, are not material. *See Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992) ("Evidence of a subsequent deterioration or change in condition after the administrative hearing is deemed immaterial."). Plaintiff may, however, submit a new claim for benefits based on this subsequent time period not considered by the ALJ.

Plaintiff has therefore failed to show the new evidence if presented, would lead the ALJ to a different disposition. Thus, she has not shown the evidence to be material as is necessary to obtain remand. As such, her request for a sentence six remand is denied.

### CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision supported by substantial evidence and affirms that decision.


　s/James R. Knepp II
United States Magistrate Judge